STATE, *ex rel.* THE FIRST SAVINGS AND TRUST COMPANY, OF TAMPA, v. DAVID SHOLTZ, GOVERNOR, J. M. LEE, State Comptroller, and W. V. KNOTT, State Treasurer, as and constituting the Board of Administration of the State of Florida; THE COUNTY OF UNION, a political subdivision of the State of Florida, and J. L. DOUGLAS, J. M. CONNER, S. M. DUKES, B. E. BROWN and WILLIE CROFT, as and constituting the Board of County Commissioners of Union County; and S. T. DOWLING, as Clerk of the aforesaid Board of County Commissioners of Union County.

169 So. 849.

Division A.

Opinion Filed September 30, 1936.

362

*Sutton, Tillman* and *Reeves,* for Relator;

*Cary D. Landis,* Attorney General, *H. E. Carter* and *James B. Watson,* Assistant Attorney General, *Hull, Landis & Whitehair* and *C. W. Luther,* for Respondents.

BROWN, J.—In 1927 the Legislature enacted a special Act, Chapter 13471, authorizing the issuance of $350,000.00 of bonds by Union County for the purpose of hardsurfacing certain State roads located in that county. The Act required the County Commissioners of the county to set aside a sum sufficient to pay the interest and provide a sinking fund to meet the principal of the bonds when due, "out of any moneys made payable by the laws of the State of Florida to said Union County, Florida, as part of the proceeds of the State Gasoline Tax provided for by Chapter 9120, Acts of 1925, Laws of Florida, and any Acts amendatory thereof, and it shall be the duty of said County Commissioners to provide for the setting aside of all the moneys received from the State as Union County's share of said

gasoline tax under the Act aforementioned, and Acts amend-
atory thereof, to meet the interest and create a sinking fund
for the retirement of said bonds at maturity, and in the
event said gasoline tax or the moneys derived therefrom
shall for any reason, by legislative Act or otherwise, be
withdrawn from the use of said Union County, Florida, or
be insufficient to meet said interest payments and create a
sinking fund sufficient to redeem said bonds at maturity,
said County Commissioners shall thereupon have power and
it shall be their duty to forthwith provide for the levy an-
nually of a tax upon all the taxable property in the county
sufficient to pay the interest on said bonds and also to create
a sinking fund for the retirement of said bonds at maturity,
and to cause the said sinking fund to be provided for by
resolution to be entered upon the minutes of the Board."

Shortly thereafter, in January, 1928, bonds were issued
and sold pursuant to this Act, and validated by decree of
the Circuit Court, all of which was shown by the recitals in
the bonds themselves, and the Act as written became a part
of the bond contract.

The relator became the owner of $43,000.00 of these
bonds, and has brought this mandamus proceeding to com-
pel the respondent officials to pay certain of the bonds which
had matured and past due interest coupons amounting to
$11,320.00, which it is alleged the respondents have refused
to pay despite the fact that some $49,000.00 of *ad valorem*
and gasoline tax moneys have accumulated in the hands of
said respondent State Board of Administration to the credit
of Union County, which constitute funds that were and are
specifically pledged for the payment of relator's said bonds
by the special Act, above quoted from, under which Act
the bonds were issued. The alternative writ was amended,
the purpose of the amendment being to eliminate any com-

mand for the payment of interest accruing on said instruments after maturity.

The Board of Administration interposed a motion to quash the alternative writ as amended, which motion to quash was adopted by the County Commissioners of Union County.

Among the grounds of the motion are the following:

. That the pledge of gasoline tax moneys under Chapter. 13471 to the payment of the bonds here involved was contingent and revocable and covered only such moneys as should be made payable by the laws of Florida to Union County "as part of the proceeds of the State gasoline tax provided for by Chapter 9120, Acts of 1923, and any Acts amendatory thereof," and that the special Act, Chapter 13471, provided that "in the event said gasoline tax, or the moneys derived therefrom, shall for any reason, by legislative Act or otherwise, be withdrawn from the use of said Union County," or should prove insufficient for interest and sinking fund purposes, the County Commissioners should thereupon provide for the levy of an annual *ad valorem* tax on all taxable property in the county sufficient to pay the interest and create the sinking fund for the retirement of the bonds.

That said Chapter 9120, Acts of 1923, was subsequently amended by Chapter 10025, Acts of 1925, and by Chapter 12037, Acts of 1927, and was further amended by Chapter 14575, Acts of 1929, and was thereafter repealed by Chapter 15659, Acts of 1931.

That subsequent to the issue of these bonds, the Legislature, by Chapter 14486, Acts of 1929, created the Board of Administration of the State of Florida; that said Act has since been amended (see Chapter 15891, Acts of 1933) and that as so amended said Act, especially Section 18 thereof, is inconsistent with the contingent and revocable

pledge of gasoline tax moneys contained in Chapter 13471 made for the payment of relator's bonds, and that said pledge has therefore been revoked, thus negativing any duty on the part of the respondents to comply with the command of the alternative writ, which would require respondents to pay relator's bonds and coupons out of gasoline tax funds to the exclusion of holders of bonds and coupons of any other issue of bonds of Union County.

It is also contended by respondents that the provisions of Chapter 15,891, Acts of 1933, known as the Kanner Act, are inconsistent with the pledge of gasoline tax moneys contained in Chapter 13471, and operates a withdrawal of such moneys, to the credit of Union County, from the conditional pledge made in said special Act.

The relators contend that the position thus taken by the respondents is untenable and arises from a misconstruction of the terms and legal effect of Chapter 13471 and the later enactments referred to. This requires some analysis of the pertinent features of these Acts.

The pledge which Chapter 13471 authorized the County to make for the payment of these bonds was "moneys made payable by the laws of the State of Florida to said Union County as part of the proceeds of the State Gasoline Tax provided for by Chapter 9120, Acts of 1925 (meaning 1923), and any Acts amendatory thereof." But this pledge was not absolute. The condition attached was that "in the event said gasoline tax or the moneys derived therefrom shall for any reason, by legislative Act or otherwise, be withdrawn from the use of said Union County," or prove insufficient to pay interest and principal, then the County Commissioners were required to levy *ad valorem* taxes sufficient to take care of these obligations and the interest thereon as they matured.

Thus the question here is whether or not "said gasoline

tax," that is, "moneys made payable by the laws of the State of Florida to said Union County as part of the proceeds of the State Gasoline Tax provided by Chapter 9120, Acts of 1923, and any Acts amendatory thereof," had been *withdrawn* by the Legislature before the funds here in question, held by the Board of Administration to the credit of Union County, had been produced and become "payable" to Union County.

Said Chapter 9120, of the Laws of 1923, is an Act of 14 sections, entitled: "An Act imposing license taxes upon gasoline or other like products of petroleum; providing for reports of sale of such commodities to the Comptroller of the State of Florida; providing for the disposition of the moneys derived from such tax and fixing a penalty for the violation of the provisions of this Act and to repeal all laws in conflict with this Act."

Section 1 of this Act required each dealer in gasoline in this State to pay an annual license tax to the State of $5.00, and an excise tax of three cents per gallon for every gallon of gasoline sold by him, payable to the Comptroller monthly, two cents of this gallonage tax to go to the State for the use of the Road Department, and one cent to the counties, each county to get an equal amount. The Act does not direct what use the counties should make of these moneys, and the tax levied was a State tax. Section 12 of the Act provided that if the equal division to the counties of the money derived from the one cent per gallon tax should be held invalid, such money should go into the State's General Revenue Fund.

Sections 1 and 12 of this Act were amended in 1925 by Chapter 10,025. But these amendments are not material here. The amendment to Section 1 raised the gallonage tax to four cents, three cents to the State for the use of

the Road Department, and one cent to be equally divided among the counties as before.

Sections 1, 2, 4, 9 and 11 of Chapter 9120 were amended by Chapter 12037, of the Acts of 1927, but none of these amendments are material to the question here presented. The most pertinent amendment was to Section 4, which amended section provided that the amount becoming due to each county should be transferred from the State Treasury and deposited with the County Depository to be used for the construction and maintenance of roads, "or otherwise, as is now or may hereafter be provided by law." The tax of one cent per gallon to be paid to the State and divided equally among the counties was left intact.

Sections 1 and 4 of Chapter 9120 were again amended, this time more radically, by Chapter 14575 of the Acts of 1929, which was approved June 21, 1929, on the same day that Chapter 14486, setting up the Board of Administration was approved. The validity and meaning of these two Acts were dealt with in the case of Amos v. Mathews, 99 Fla. 1, 126 So. 308.

Said Chapter 14575 raised the gallonage tax on gasoline to five cents per gallon, the five cent tax being made up of four separate taxes, as follows:

First gas tax: Two cents per gallon for the use of the State Road Department.

Second gas tax: One cent per gallon to be apportioned to the several counties in proportion to the amount collected in each of such counties respectively.

Third gas tax: One cent per gallon to be apportioned to the several counties in proportion to the amount of their road and bridge bonded indebtedness, including special tax road and bridge districts.

Expenditure of the proceeds of the second and third gas tax was restricted to the payment of existing bonded in-

debtedness of the counties and special road and bridge districts outstanding on April 1, 1929, and not for the payment of any particular bond issue.

Fourth gas tax: One cent per gallon to be apportioned equally among the several counties, two-thirds of which shall be "used for school purposes" and one-third for the construction of roads and bridges "in the county."

In the case of Amos v. Mathews, *supra,* this Court held that the above Act, Chapter 14575, and the Board of Administration Act, Chapter 14486, should be construed *in pari materia;* that the Legislature has no power to levy a *State* tax for the purpose of paying county and district bonds; that the second and third gas taxes, and the one-third of the fourth gas tax levied for the construction of roads and bridges "in the county," were levied for local county purposes, and were to be regarded as *county* taxes, collected within the county, and that the revenue therefrom constituted county funds and must be apportioned to the counties in proportion to the amount collected therein respectively; that after such apportionment, the funds derived from the second and third gas taxes must be applied by the Board of Administration to the payment of county and district road and bridge bonds outstanding on April 1, 1929, so far as is necessary to meet current annual requirements for interest and sinking funds of the participating bonds, as directed by said Chapter 14,486.

Section 18 of Chapter 14,486, stated that it was the intention of the Act that all county road and bridge obligations outstanding at the time of the passage of the Act "shall be eligible to participate in the distribution of such money."

It would appear, therefore, that insofar as Chapter 13471, under which these bonds were issued, constituted an *exclusive* pledge of all gasoline tax moneys "made payable by

the laws of the State of Florida to said Union County as part of the proceeds of the State gasoline tax provided by Chapter 9120, Acts of 1923, and Acts amendatory thereof, such exclusive pledge was "withdrawn" by said Acts of 1929, Chapters 14575 and 14486, the effect of which Acts was to make all the bond issues of Union County for road and bridge purposes outstanding on April 1, 1929, eligible to participate in the apportionment of the second and third gas taxes, which were declared by this Court to be *County* as distinguished from *State* taxes. And the proceeds of the fourth gas tax was expressly allocated by the Act to school purposes and the construction of roads and bridges in the County. These provisions are inconsistent with and repugnant to the exclusive pledge made by the Act under which the bonds here involved were issued, which Act, by its language, put the bondholders on notice that said pledge of the gasoline tax moneys payable to Union County might be "withdrawn by legislative Act.

Furthermore, the plan set up by said Chapter 9120 and the amendatory Acts above referred to, by which part of the proceeds of the gasoline taxes levied by the State might reach the counties for application upon their bonded indebtedness, was changed by Chapter 15659 of the Acts of 1931, which was a general revision of the subject dealt with by Chapter 9120 and expressly repealed Chapter 14575, Acts of 1929, which amended Sections 1 and 4 of Chapter 9120, and all other laws in conflict therewith. Instead of the provisions made by Chapter 9120 as amended by Chapter 14575, the Act of 1931 levied a tax of six cents per gallon, made up of two separate taxes: a "First Gas Tax" of three cents per gallon for the use of the State Road Department, and a "Second Gas Tax" of three cents per gallon, apportioned to the counties as follows: one cent, in proportion to area; one cent in proportion to population,

and one cent in proportion to the amount expended by the counties and districts therein to the construction of roads which were then or thereafter made a part of the State road system. The Comptroller was required to ascertain the proportionate amount of the moneys derived from the second Gas Tax due to each county, which sums were required to be paid monthly (on the Comptroller's order on the State treasury) to the State Treasurer as *ex officio* County Treasurer, all of such moneys to be administered by the Board of Administration "as provided by law." The "law" providing how the funds derived from gasoline taxes and certain other sources, and allocated to the several counties, should be administered, was Chapter 14,486, which provided, as we have seen, that all county and district road and bridge bonds outstanding on April 1, 1929, should be eligible to participate in the distribution of such gas tax moneys. This Chapter 15659 was held valid and constitutional in the case of Carlton v. Mathews, 103 Fla. 301, 137 So. 815. So this statute, construed in connection with Chapter 14,486, was inconsistent with and repugnant to the provision in the special Act under which the bonds here in question were issued insofar as the special Act preferentially pledged all the proceeds of the State gasoline taxes payable to Union County to the payment of the interest and principal of this particular issue of bonds.

Section 14 of said Chapter 14486 was amended by Chapter 15891 of the Acts of 1933. In the case of Florida National Bank v. State Board of Administration, 115 Fla. 753, 154 So. 876, 156 So. 15, it was held that the purpose of this Act "is to permit the State Board of Administration, by and with the approval of the County Commissioners of the affected county, to use any and all of the unappropriated moneys derived from the gasoline tax, as credited to the account of the county or road and bridge district, for the

purpose of purchasing, at a price below the par value thereof, and at the lowest bid offered, any bond or bonds of such road district, road and bridge district, or county road bond issue to which such moneys have been credited in the hands of the State Board of Administration. This they may do to the extent that such gasoline moneys have not been appropriated as a substitute for the levy of ordinary debt service taxes to take care of the interest and sinking fund requirements *of the outstanding bonds of the county."* (Italics supplied.) So Chapter 14486 as amended by the Kanner Act, as thus interpreted, is also inconsistent with the theory that the county's apportionment of gasoline tax moneys is, under existing general statutes, subject to be applied first to the payment in full of the interest or principal of one particular bond issue of a county or district before other bond issues of the same county or district would be entitled to participate. Therefore, it cannot be said that Chapter 15659, construed in connection with Chapter 14486 as amended by Chapter 15891, is consistent with the *exclusive* pledge of the gas tax moneys payable by the State to Union County, for the payment of one particular issue of bonds, as made by the special Act authorizing the issue of relator's bonds, or that said Chapter 15659 reinstated the status of that pledge to what it was before it was withdrawn by Chapters 14575 and 14486 of the Laws of 1929. But this leaves the holders of bonds of this issue the same right to participation in the benefits of gasoline tax moneys under Chapters 15659 and 14486 as the holders of bonds of other issues of the same county.

It may well be that if the pledge made by the special Act, Chapter 13471, of the gas tax moneys payable to Union County, for the benefit of these bonds, had been absolute and unconditional, no subsequent legislation could have impaired the contract obligation thus created, but as we

have seen, this pledge was conditional, the special statute expressly contemplating that it could be "withdrawn" by legislative Act.

These conclusions have been arrived at in the light of the following legal principles:

The rule prevailing at common law was that when a repealing statute is itself repealed, the first statute is revived without any formal words for that purpose, in the absence of a contrary intention expressly declared, or necessarily to be implied from the enactment by which the last repeal is effected, and it mattered not whether the repeal in either case was by express language or by implication. See 59 C. J. 941. But this rule was changed by an early statute of this State, now Section 90 of the Compiled Gen. Laws of 1927, which reads:

"No statute of this State which has been repealed shall ever be revived by implication; that is to say, if a statute be passed repealing a former statute, and a third statute be passed repealing the second, the repeal of the second statute shall in no case be construed to revive the first, unless there be express words in the third statute for this purpose."

In 59 C. J., at page 942, it is said:

"When applicable, a statute providing that, where an Act repealing, in whole or in part, a former Act, is itself repealed, the last repeal shall not revive the Act before repealed, unless it is expressly so provided; will be given effect. Such a provision applies not only to laws expressly repealed, but also to repeals by implication. However, it applies only to cases of absolute repeal, and not to cases where the original Act has been merely suspended, amended, supplemented, or modified, or exceptions thereto have been created. Also, it has only a prospective effect.

"Where one Act amends another so as to read as prescribed in the former, the repeal of the amendatory Act

does not revive the original law. However, this canon of construction is not absolute, but will yield to a contrary intention apparent from the language employed or from statutes *in pari materia;* and this modification is itself subject to the further doctrine that a legislative intent to revive a law which has by legislative action been wholly annihilated is not alone, and without the use of language which is at least equivalent to re-enactment, sufficient to accomplish the revival."

In this connection, see Forbes v. Board of Health, 27 Fla. 189, 9 So. 446; Fla. Cent., etc., R. Co. v. Foxworth, 41 Fla. 1, 25 So. 338, 79 A. S. R. 149; 25 R. C. L. 632-635.

Where a statute covers the whole subject matter of an earlier Act, and was evidently intended to be a revision of or substitute for the earlier Act, it operates as a repeal of the earlier Act to the extent that the former Act's provisions are revived and supplied, though the later Act contains no express repealing provision. State v. Stoutamire, 98 Fla. 486, 123 So. 834, and cases cited.

This does not involve the ordinary question of whether a later general Act repeals an earlier local Act. Here the local or special statute under which the bonds were issued in substance merely provided that the moneys payable to the county out of the State Gasoline Tax under a certain existing general statute, and any Acts amendatory thereof, should be applied to the payment of the bonds, but that if the use of these moneys should be withdrawn from Union County by legislative Act or otherwise, or should prove insufficient, then the County Commissioners should levy *ad valorem* taxes sufficient to meet the interest and sinking fund requirements. In such a case, the repeal of the general law does not repeal the local law, but merely changes its alternative operation as provided in the local law itself.

But if the situation were otherwise, the rule is well

settled that where a general Act is a general revision of the whole subject, or its provisions are so repugnant to or irreconcilable with those of the earlier local Act as to indicate a legislative intent that the local Act should yield to the operative effect of the general Act, then to the extent that the provisions of the local Act are irreconcilable with those of the general Act, the local Act is, to that extent at least, repealed. Sanders v. Howell, 73 Fla. 563, 74 So. 802; Langston v. Dunsford, 122 Fla. 813, 165 So. 898, and cases cited.

Relator contends that the motion to quash should be overruled on the authority of State, *ex rel.* Suwannee River Bridge Co., v. Sholtz, *et al.,* 158 So. 812, 119 Fla. 460, and State, *ex rel.* Andrews, v. Sholtz, *et al.,* 120 Fla. 423, 162 So. 865. It may be that relator could so amend the alternative writ as to bring it within the principles enunciated in the cases thus cited, but the writ as drawn does not fall within the applicable scope or operative effect of those principles.

The motion to quash the amended alternative writ is sustained, but the relator is granted fifteen days within which to apply for leave to amend its alternative writ as it may be advised.

It is so ordered.

WHITFIELD, C. J., and DAVIS, J., concur.

ELLIS, P. J., and TERRELL and BUFORD, J. J., concur in the opinion and judgment.